IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**MOHAMMED AL AMIN,** *et al.*,            )
    *Petitioners/Plaintiffs*,              )
                                          )
**v.**                                     )  Civil Action No. 05-02336 (PLF)
                                          )
                                          )
**GEORGE W. BUSH,** *et al.*,              )
    *Respondents/Defendants*.              )
_____)

**MOHAMMED AL AMIN'S OPPOSITION TO THE GOVERNMENT'S MOTION
TO EXAMINE PRIVILEGED COMMUNICATIONS SEIZED
WITHOUT NOTICE OR APPROVAL**

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ................................................................................................ 5
      A.    The Investigation ................................................................................ 5
      B.     Suicides at Guantanamo ................................................................... 6

II.   The Government's Seizure and examination of Mr. Al Amin's Legal Papers was
      unlawful ........................................................................................................... 9
      A.    The Government Has Long Sought To Thwart the Attorney-Client Rela-
            tionship ............................................................................................... 11
      B.    Mr. Al Amin's Legal Papers May Not Be Seized and Reviewed Without
            An Individualized Showing of Probable Cause .................................. 13
      C.    The Government Has Made No Such Individualized Showing ............ 16

III.  Any further review of Mr. Al Amin's legal papers should be by the court or a spe-
      cial master ....................................................................................................... 18

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adem v. Bush*,
     425 F. Supp. 2d 7 (D.D.C. 2006) ...................................................................................12

*Al Odah v. United States*,
     346 F. Supp. 2d 1 (D.D.C. 2004) ........................................................................13, 18, 20

*Bach v. Illinois*,
     504 F.2d 1100 (7th Cir. 1974) .....................................................................................13

*Bell v. Wolfish*,
     441 U.S. 520 (1979).....................................................................................................10

*Black v. United States*,
     172 F.R.D. 511 (S.D. Fla. 1997).................................................................................18

*Block v. Rutherford*,
     468 U.S. 576 (1984).....................................................................................................10

*Doe v. United States*,
     No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003)..................................15

*Evans v. Vare*,
     402 F. Supp. 2d 1188 (D. Nev. 2005) ..........................................................................10

*In re Grand Jury Subpoenas 04-124-03 and 04-124-05*,
     Nos. 05-2274, 05-2275, 2006 WL 1915386 (6th Cir. July 13, 2006)..........................18, 20

*In re Grand Jury Subpoenas Duces Tecum*,
     798 F.2d 32 (2d Cir. 1986)..........................................................................................15

*Hudson v. Reno*,
     458 U.S. 517 (1984).....................................................................................................10

*Johnson-El v. Schoemehl*,
     878 F.2d 1043 (8th Cir. 1989) .....................................................................................13

*Lanza v. State of New York*,
     370 U.S. 139 (1962).....................................................................................................13

*Lonegan v. Hasty*,
     No. 04 CV 2743 (NG)(VVP), 2006 WL 1707258 (E.D.N.Y. June 22, 2006)...............9, 10

*Procunier v. Martinez*,
  416 U.S. 396 (1974)....................................................................................14

*Rasul v. Bush*,
  542 U.S. 466 (2004)....................................................................................12

*In re Richard Roe, Inc.*,
  68 F.3d 38 (2d Cir. 1995) ...........................................................................15

*Sallier v. Brooks*,
  343 F.3d 868 (6th Cir. 2003) ......................................................................10

*Scurto v. Commonwealth Edison Co.*,
  No. 97 C 7508, 1999 U.S. Dist. LEXIS 513 (N.D. Ill. Jan. 11, 1999)..............14

*In re Sealed Case*,
  107 F.3d 46 (D.C. Cir. 1997) ......................................................................15

*In re Search of the Scranton Hous. Auth.*,
  No. 04-MISC, Nos. 318-322, 2006 WL 1722565 (M.D. Pa. Jun. 22, 2006)....................18

*In re Search Warrant for Law Offices Executed on March 19, 1992*,
  153 F.R.D. 55 (S.D.N.Y. 1994) ...................................................................19

*Swidler & Berlin v. United States*,
  524 U.S. 399 (1998)....................................................................................13

*United States v. Abbell*,
  914 F. Supp. 519 (S.D. Fla. 1995) ..............................................................18

*United States v. Defonte*,
  441 F.3d 92 (2d Cir. 1006)........................................................................9, 10

*United States v. Grant*,
  No. 04 CR 207 BSJ, 2004 WL 1171258 (S.D.N.Y. May 25, 2004)..............15, 16

*United States v. Jones*,
  696 F.2d 1069 (4th Cir. 1982) ....................................................................11

*United States v. Neill*,
  952 F. Supp. 834 (D.D.C. 1997) .................................................................19

*United States v. Skeddle*,
  989 F. Supp. 890 (N.D. Ohio 1997).............................................................15

*United States v. Stewart*,
    No. 02, CR 396 JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002)....................15, 18, 19

*United States v. Zolin*,
    491 U.S. 554 (1989)...............................................................................................10, 11

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981)...........................................................................................13

**INTRODUCTION**

Having seized Petitioner Mohammed Al Amin's ("Al Amin") property, including materials unquestionably protected by the attorney-client privilege, the government now asks the Court to ratify its seizure, and to further bless an arrangement for future reading of Mr. Al Amin's privileged materials. [1]  As a matter of fundamental principle, and by specific order of this Court, those communications were supposed to be secure against seizure and review by the government.  The government's seizure and review of Mr. Al Amin's communications, without prior notice to and approval by the Court, and without notice to counsel, was illegal.  The government's failure to disclose its actions to the Court and counsel until nearly a month after the fact is deplorable, to say the least.

---

[1]     Counsel is aware that on July 20, 2006, the government filed a Notice of Withdrawal of Its Motion for Procedures Related to Review of Certain Detainee Materials and Motion for Expedited Briefing in Mr. Al Amin's case.  *See* Docket No. 18.  However, one of the government's possible reasons for the Notice of Withdrawal was that "respondents have been unable to identify petitioners as detainees currently detained at Guantánamo Bay."  This possible rational is worrisome to counsel because the government has previously argued to this Court that Mr. Al Amin was one of several other detainees at Guantánamo Bay and that there were *no* detainees at the prison with his name.

For example, on December 13, 2005, in response to Mr. Al Amin's *writ of habeas corpus,* the government filed a Notice of Multiple Petitions arguing, without evidentiary support, that Mr. Al Amin previously filed a *habeas* petition as Ahamed Abdul Al Amin, No. 05-CV-0492 (JR).  *See Al Amin v. Bush,* Case No. 05-02336-PLF, Dkt. No. 4.  On December 15, 2005, Mr. Al Amin's counsel responded, and attached exhibits attesting to the separate identities of Mr. Al Amin and Mr. Al Amin.  *Al Amin v. Bush,* Case No. 05-02336, Dkt. No. 6, including Exhibits A and B.  On December 20, 2005, Respondents acknowledged their error, and filed a Supplemental Notice of Multiple Petitions in which they said that "the prior identification of petitioner Mohammed Al Amin as Detainee . . . [Al Amin] . . . should be disregarded."  *Id.*, Dkt. No. 7.  The government then claimed, again without any evidentiary support, that Mr. Al Amin is detainee Muhammed Sidii ("Sidii").  *Id.*  Thus, in March 2006, counsel for Al Amin traveled to Guantánamo Bay to resolve any ambiguity.  During the course of meeting with Mr. Al Amin it was clear that he was, in fact, Al Amin and not Sidii.

Because of the government's confusion regarding Mr. Al Amin's identity, counsel believes the filing of this Motion and Opposition is appropriate and necessary.

Particularly egregious is the fact that among the seized materials are materials counsel sent to Mr. Al Amin to assist him in his Administrative Review Board hearing, the only review currently provided by the government that permits Mr. Al Amin to attempt to demonstrate that he should not continue to be held in indefinite detention for the rest of his life.  Mr. Al Amin is currently held based on secret evidence, secured by torture, that he has not had the opportunity to see or challenge.  He was denied the assistance of counsel at his Combatant Status Review Tribunal and counsel may not be present at the ARB.  The only assistance counsel may provide is answers to the written questions Mr. Al Amin has asked and copies of the submissions made on his behalf to the Review Board.  Now the government has taken even that minimal assistance away from him.

Moreover, the government confiscated Mr. Al Amin's attorney-client communications without making any showing that Mr. Al Amin was involved in any communications with other detainees regarding the suicides or that he had commingled privileged materials with other documents.  The government does not suggest any basis for believing that Mr. Al Amin has any documents related to its investigation.

The government seized and examined these privileged communications over a five-day period without court approval or supervision, and without prior notice to Mr. Al Amin's counsel, and then waited nearly a month before disclosing its actions.  The fact that Mr. Al Amin's legal papers were seized over a five-day period demonstrates that no exigent circumstances required the government to act without first seeking the approval of the Court and notifying his counsel.  At the very least, a conference call with Mr. Al Amin's counsel and, if necessary, Magistrate Judge Kay, could have been arranged.  *See* LCvR 40.1(c), 65.1, 57.8.

It is for these reasons that the American Bar Association ("ABA") has called for an investigation into this unprecedented breach of the privilege.[2]   The ABA letter stated, in part, the following:

> [The ABA] endorsed certain basic principles for the conduct of military commission trials, including that the "government should not monitor privileged conversations, or interfere with confidential communications, between any defense counsel and client."
>
> [The ABA is] therefore deeply troubled by the revelations contained in the July 7, 2006 Department of Justice filing in the Guantánamo habeas cases . . . that military investigators, in the course of investigating the deaths of three Guantánamo detainees in June, seized from Guantánamo detainees **more than a half-ton** of documents, including a large number of highly privileged attorney-client communications.
>
> * * *
>
> As you know, almost all of the civilian lawyers involved in the Guantánamo military commission and habeas cases have appeared *pro bono* at great personal and financial sacrifice and under difficult conditions. . . . It has been a challenge for these dedicated lawyers to gain the trust of their clients, and the recent seizure of these highly privileged communications could chill the attorney-client relationship and shatter any confidence the detainees might have had in the sanctity of the attorney-client privilege.
>
> [The ABA] therefore respectfully ask[s] the Committee to request that the Inspectors General for the Department of Defense and the Justice Department investigate this matter promptly and make their findings and conclusions public in a report to the Committee.  We also ask the Committee to request that the Office of Professional Responsibility in the Department of Justice to determine how the government's lawyers permitted this potentially serious breach to occur, and to take appropriate action.

(emphasis in original).

The government's seizure and examination of Mr. Al Amin's materials violated not only this Court's orders directing the government to respect the attorney-client privilege, but also the

---

[2]     *See* Letter dated July 11, 2006, from Michael S. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy, *available at*, http://www.abanet.org/op/greco/memos/aba_sjud-militarytribunalprivilege_letter_0706.pdf (attached as Exhibit 1 hereto) at 1-2.

Protective Order entered by this Court to ensure the protection of that privilege. Having belatedly disclosed its illegal seizure and examination of Mr. Al Amin's documents, the government now asks the Court to condone its actions and permit it to retain the seized materials and examine them even more closely.

The government's motion should be denied.

The Court should order the government to deliver Mr. Al Amin's legal papers to his counsel and destroy any and all copies, summaries, descriptions, or analyses of such papers that may have been made. If the Court decides to allow any further review, such review should be conducted in the first instance by the Court or a special master without the involvement of the military or the Department of Justice.

## ARGUMENT

### I.    BACKGROUND

#### A.    The Investigation

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been found dead in their cells with wads of cloth stuck in their mouths. The military reported the prisoners' deaths as suicides.[3]

According to the declarations of Admiral Harris and Special Agent Carol Kisthardt, the Naval Criminal Investigative Service (NCIS) initiated an investigation to determine "the manner and cause of death" of the three prisoners.[4]

---

[3]    U.S. Southern Command News Release, *Three Detainee Deaths at Guantanamo Bay*, June 10, 2006, *available at* http://www.southcom.mil/pa/Media/Releases/USSOUTHCOM%20 PRESREL%20Detainee%20Death%20FINAL%20%20(1415%2010%20Jun%2006).doc; *Gen. John Craddock's Opening Statement*, Press Conference, June 10, 2006, *available at* http://www. southcom.mil/pa/News/June%202006/News060610-001.htm; Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/ news/Jun2006/20060610_5379.html.

Now, nearly a *month* later, the government has disclosed that, between June 10 and June 14, as part of the investigation, NCIS seized and examined over a half-ton of written communications between Guantánamo prisoners and their lawyers.[5]  The government claims that it seized ***all*** prisoners' legal papers because notes found in the cells of the *three* dead prisoners suggested that the prisoners *might* have used the cloak of the attorney-client privilege in furtherance of a suicide "plot" by the prisoners.[6]

However, in a recent court filing, attorney Anant Raut submitted a declaration that describes a letter from his client dated May 31, 2006, before the reported prisoner deaths occurred, reporting that the government had taken away his clients' correspondence and legal materials.[7]  In addition, the Raut Declaration reports that on May 17, 2006 the government had given his client only 20 minutes to read a letter from his attorneys before taking it away as well.[8] Thus, the invasion into the attorney client privilege may be of longer duration than the government indicates.

## B.    Suicides at Guantanamo

The Court should not allow the government to examine any of Mr. Al Amin's seized materials on the premise that prisoners may be "plotting" to take their own lives.  The situation that the prisoners confront – over four years in prison on an isolated island, charged with no offense, unable to see and therefore refute the evidence on which they are imprisoned, subject to

---

[4]    Harris Decl. ¶ 2; Kisthardt Decl. ¶ 2.

[5]    Kisthardt Decl. ¶¶ 2-5.

[6]    Harris Decl. ¶ 4.

[7]    Raut Decl. ¶ 6 (attached as Exhibit 3 hereto).

[8]    *Id*. at ¶ 7.

brutal and contemptuous treatment by their keepers and medical neglect, with no end of their

imprisonment in sight – is sufficient to account for any and all possible suicidal acts.

If prisoners take their own lives at Guantánamo it is because of the hopelessness of their

situation and, at least in some instances, the effect of the government's interrogation techniques

on their mental health.  Breaking the prisoners' spirits and psyches for the purpose of collecting

intelligence is Guantánamo's *raison d'etre*.  As Physicians for Human Rights has stated,

"psychological torture [is] central to the interrogation process and reinforced through conditions

of confinement."[9]

Prisoners have been subjected to a variety of other cruel, inhuman, and degrading

treatment, including prolonged exposure to extreme heat and cold, religious humiliations

(including abuse of the Koran and interference with prayers), threats of execution, threats against

family, and prolonged solitary confinement.  The classified 50-day interrogation logs of one

"high value" prisoner, published last year by *Time*, discloses terrors from which no human could

be expected to emerge mentally intact.[10]  Government doctors "assisted in the design of

---

[9]     Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* (2005).  Approved interrogation techniques have included "Removal from social support at Camp Delta"; "Segregation in Navy Brig"; "Isolation in Camp X-Ray"; "Deprivation of light"; "Inducing stress [through] use of female interrogator"; "Up to 20-hour interrogations"; "Removal of all comfort items, including religious items."  Dep't of Defense, *GTMO Interrogation Techniques* (June 22, 2004). Evidence indicates that the government has also used even more brutal techniques, labeled "Fear Up Harsh," "Sleep Adjustment," and "Futility."  *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operation Considerations*, at A1-A3 (2003), available at http://ccr-ny.org/V2/reports/docs/PentagonReportMarch.pdf.

[10]     According to the interrogation logs, authorities held this prisoner in solitary confinement until he became delusional; subjected him to weeks of interrogations lasting 18-20 hours a day; made him bark, growl, and perform dog tricks; forced him to wear a woman's bra and placed a thong on his head; menaced him with dogs; hydrated intravenously and then denied access to a toilet; and, even after his heartbeat had slowed to 35 beats per minute and he was placed in a

(continued…)

interrogation strategies, including sleep deprivation and other coercive methods tailored to

prisoners' medical conditions.  Medical personnel also coached interrogators on questioning

technique."[11]  Mr. Al Amin's detention at Guantánamo Bay has been no different.

Predictably, these tactics have caused the mental health of many Guantánamo prisoners

to deteriorate — including, as noted above, Mr. Al Amin.  According to government data,

prisoners committed 350 acts of "self-harm" in 2003, of which 120 were attempted hangings.[12]

In August 2003, 23 men attempted to hang themselves.[13]  The government chose to describe all

but two of these hangings as incidents of "manipulative self-injurious behavior," rather than as

suicide attempts.[14]  In 2004, also according to government data, prisoners committed another 110

---

doctor's care, played screaming loud music in his cell to "prevent detainee from sleeping."  The
Deputy Assistant Director of the FBI complained to the Pentagon about this treatment after
finding this prisoner in his cell "evidencing behavior consistent with extreme psychological
trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell
covered with a sheet for hours on end)."  Letter from T.J. Harrington, Dep'y Assist. Dir., FBI
Counterterrorism Div., to Maj. Gen. Donald J. Ryder, U.S. Army (July 14, 2004),
http://www.aclu.org/torturefoia/released/FBI_4622_4624.pdf.

[11]      M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, New Eng. J. Med.,
Jan. 6, 2005, at 3.  According to the British medical journal *The Lancet*, "medical records [have
been] routinely shared with interrogators in clear breach of confidentiality and with the
knowledge that such information can be misused[,] despite objections by the medical team of the
International Committee of the Red Cross." Editorial, *How Complicit are Doctors in Abuses of
Detainees?*, The Lancet, Aug. 21, 2004, at 637.  *See also* Jane Mayer, *The Experiment*, New
Yorker, July 11 & 18, 2005, *available at* http://www.cageprisoners.com/downloads/Mayer.pdf.
The American Medical Association ("AMA") and American Psychiatric Association ("APA")
have now adopted ethical guidelines that limit participation in interrogation.  *See* AMA, *New
AMA Ethical Policy Opposes Direct Physician Participation in Interrogation*, June 12, 2006,
*available at* http://www.ama-assn.org/ama/pub/category/16446.html; APA, *APA Statement on
Psyciatric Practices at Guantanamo Bay*, June 27, 2005, *available at*
http://www.psych.org/news_room/press_releases/05-40psychpracticeguantanamo.pdf.

[12]      Mark Denbeaux, *Report:  The Guantánamo Detainees During Detention* (July 10, 2006),
attached as Exhibit 2.

[13]      *Id.*

[14]      *Id.* at 14.

acts of "manipulative self-injurious behavior," though it did not report how many of these 110

incidents were attempted hangings.[15]  Even with its penchant for defining suicides as

"manipulative self-injurious behavior," the government has acknowledged that 29 prisoners have

attempted suicide a total of 41 times.

    The results were obvious and foreseeable.  At the very least, the government must

demonstrate to the court a factual basis to support its assertion that *Mr. Al Amin* was someone

*even remotely* involved with, or had prior knowledge of, these deaths before it engages in the

wholesale seizure of his privileged papers as part of an investigation of a suicide "plot."

## II.   THE GOVERNMENT'S SEIZURE AND EXAMINATION OF MR. AL AMIN'S LEGAL PAPERS WAS UNLAWFUL

    It is well-established that incarcerated or detained individuals do not forfeit the attorney-

client privilege upon detention.[16]  The right to this privilege does not diminish when the clients

stand accused of terrorism charges that implicate national security.  For instance, in *Lonegan v.*

*Hasty*, No. 04 CV 2743(NG)(WP), 2006 WL 1707258 (E.D.N.Y. June 22, 2006), the court found

that a terrorism suspect and his attorney had a "constitutionally protected reasonable expectation

of privacy in their communications."[17]  And here, petitioners have not even been charged with a

crime.

    Recognizing and protecting the attorney-client privilege of prisoners, courts have acted

with "heightened concern" when prison officials open and read mail that "has import for . . . the

---

[15]      *See id.* at 6.

[16/]     *United States v. Defonte*, 441 F.3d 92, 94 (2d Cir. 1006).

[17/]     *Id*. at *18.

attorney-client privilege."[18]  Although courts have approved prison policies that allow prison officials "to open legal mail and inspect it for contraband in the presence of the prisoner," courts have specified that the mail "can be opened (*although not read*) and inspected for contraband."[19] Other courts have allowed the scanning of legal materials and have described scanning as "looking for drugs and physical contraband under the staples and in the pages, and looking at the title names of documents."[20]  Besides protecting legal mail, the Second Circuit has stated that prisoners' notes or "an outline of what a client wishes to discuss with counsel – and which is subsequently discussed with one's counsel –would [also] seem to fit squarely within our understanding of the scope of the [attorney-client] privilege."[21]

None of the cases cited by the government to justify their substantive review of prisoners' materials involved the wholesale search of attorney-client privileged documents.  Rather, the cases involved searches for contraband, not review of written materials.  *Bell v. Wolfish*, 441 U.S. 520, 555-557 (1979) (search for contraband); *Hudson v. Reno*, 458 U.S. 517, 527 (1984) (search for drugs or contraband); *Block v. Rutherford*, 468 U.S. 576, 589-592 (1984) (search of prisoner's cell conducted without presence of prisoner).  Similarly, the government cites *United States v. Zolin*, 491 U.S. 554, 562-63 (1989) and *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) for the proposition that the attorney-client privilege does not apply to communications made in furtherance of committing a crime or tort.[22]  Neither case supports the

---

[18]/    *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003).

[19]/    *Id*. (emphasis added).

[20]/    *Evans v. Vare*, 402 F. Supp. 2d 1188, 1192 n.1 (D. Nev. 2005).

[21]/    *Defonte*, 441 F.3d at 96.

[22]/    Emergency Mot. at 16.

governments position here.  *Zolin* requires a threshold showing of a factual basis to "support a good faith belief by a reasonable person" prior to in camera review of attorney-client materials *by the district court.*[23]  The government has made no factual showing regarding Mr. Al Amin's connection to past or future crimes or torts.  *Jones* concerns disclosure by the client of privileged materials.  No such disclosure has been made by Mr. Al Amin.

Furthermore, this Court has ruled that prisoners held at Guantánamo, including Mr. Al Amin, have a right to representation by and have access to counsel.  The Court has recognized that the attorney-client privilege attaches to communications between the prisoners and their lawyers, and it has gone to great lengths to protect that privilege by creating access procedures protecting the confidentiality of attorney-client communications.  The Court should not ratify the government's violations of the Court's orders by permitting it to continue reviewing Mr. Al Amin's privileged communications that it has seized.

## A.    The Government Has Long Sought To Thwart the Attorney-Client Relationship

The Court should consider the government's recent actions, and its instant motion, in light of its efforts to make the attorney-client relationship as difficult as possible to establish and its continuous attempts to undermine that relationship.

Most of the prisoners at Guantánamo have been held there for over four years.  Four-and-a-half years ago, when the first next-friend habeas petitions were filed on behalf of prisoners, the government responded by asserting that the prisoners had no right to seek relief in federal court and no rights for a federal court to enforce.  While these issues were being litigated, the government denied the prisoners access to counsel.

---

[23]/    491 U.S. at 572.

In 2004, the Supreme Court rejected "the proposition of Guantánamo Bay as a legal black hole."[24]  Unfazed, the government insisted that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to be imposed as it saw fit."[25]  Judges of this Court "flatly rejected" the government's position and its effort to impose "significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees."[26]

Once counsel began to meet with their clients, the government immediately undertook to undermine the attorney-client relationship.  Interrogators fueled mistrust of the lawyers among the prisoners and punished prisoners for meeting with lawyers.  For instance, interrogators told several detainees that their lawyers were spies.  Interrogators asked other prisoners, "did you know your lawyers are Jews?"[27] and warned prisoners that they would never be released if they retained counsel.  Immediately after they met with their lawyers for the first or second time, several detainees were forced to wear immodest clothing, subjected to extreme temperatures, or prohibited from praying.  Several prisoners have also previously had their legal papers searched.[28]

---

[24]     *Adem v. Bush*, 425 F. Supp. 2d 7, 11 (D.D.C. 2006) (citing *Rasul v. Bush*, 542 U.S. 466, 484 (2004).

[25]     *Id.* at 12.

[26]     *Id.* at 11–12.

[27]     Frank Davies, U.S. Interrogators Accused of Trying to Divide Detainees, Attorneys (Knight Ridder), May 13, 2005, available at  http://www.commondreams.org/headlines05/0513-04.htm.

[28]     *See* Raut Decl. ¶ 6.

### B.    Mr. Al Amin's Legal Papers May Not Be Seized and Reviewed Without An Individualized Showing of Probable Cause

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."[29]  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[30]  As this Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[31]

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[32]  For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[33]  Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably

---

[29]     *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[30]     *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[31]     *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

[32]     *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials.  When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[33]     *Bach*, 504 F.2d at 1102.

obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[34]

  To give meaning to the attorney-client privilege in this context, the Court implemented Access Procedures which created avenues of confidential communication between Mr. Al Amin and his attorneys by laying the ground rules for in-person meetings, and for written communication between him and his counsel.  The government sought the ability to monitor these communications, but that request was squarely rejected by the Court.

  There is no question that Mr. Al Amin was in possession of materials that are protected by the attorney-client privilege.  As stated in the Matthew K. Handley Declaration, ("Handley Decl."), filed herewith, counsel has sent Mr. Al Amin no less than five letters in the past year that included attorney-client materials – including advice from counsel about his upcoming Administrative Review Board hearing.

  While the government's actions violated the Protective Order and accompanying Access Procedures, Mr. Al Amin's counsel has fully and completely complied with all of the Court's orders, including the Protective Order and Access Procedures.  However, the government does not attempt to justify its actions under the Protective Order, but rather admits that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege."[35]  But the government's unilateral abrogation of the privilege would have been unlawful even if it had not directly violated a Court order.  Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege.  For

---

[34]   *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

[35]   Emergency Mot. at 9.

example, where the government invokes the crime-fraud exception to the attorney-client

privilege, it bears the burden of making an adequate showing that the exception applies – i.e.,

that *that* client "made or received the otherwise privileged communication with the intent to

further an unlawful or fraudulent act," and actually carried out that act.[36]  Similarly, when the

government seizes materials from a location that likely contains privileged papers, that seizure

must be supported by probable cause and a warrant, and it still must employ appropriate means

of screening out privileged materials.[37]

The government has not cited any cases that suggest the privilege may be invaded

without an *individualized*, sufficiently rigorous showing that the materials of a particular client or

particular attorney are likely to have been abused in furtherance of a crime.[38]

### C.    The Government Has Made No Such Individualized Showing

The government has presented no specific evidence that Mr. Al Amin has misused his

attorney-client materials.  Indeed, the government does not even purport to do so.  Four or five

---

[36]    *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No.
03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where
government failed to meet burden of showing that crime-fraud exception applied); *In re Richard
Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a
crime or fraud has been attempted or committed and that attorney-client communications were
used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34
(2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden
of showing that the crime-fraud exception applied to the documents the corporation failed to
produce).

[37]    *See, e.g., United States v. Stewart*, No. 02 CR 396 JGK, 2002 WL 1300059 (S.D.N.Y.
June 11, 2002).

[38]    *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting
review of attorney-client materials "[i]n light of the finding of probable cause that had preceded
the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207 BSJ, 2004
WL 1171258, at *2 (S.D.N.Y. May 25, 2004) (documents "seized pursuant to a valid warrant,
which was based upon a [judicial] finding of probable cause").

documents seized from just a few prisoners cannot justify seizing over half-a-ton of privileged materials from hundreds of prisoners. Careful examination of the facts asserted by the government shows no basis whatsoever for permitting the government to read Mr. Al Amin's privileged materials. He has not been alleged to have taken part in a suicide pact or participated in any other wrongful activity. Indeed, the government avoids naming the few prisoners it suspected to have some involvement in the events under investigation, because it wants to cast a wider net than justified by the facts.

The seized documents, moreover, offer little support for the government's position that attorney-client materials are being misused – let alone specific evidence that Mr. Al Amin has misused such materials.

The NCIS apparently reviewed the materials of eleven prisoners. Emergency Mot. at 7. One prisoner, not Mr. Al Amin, was found to have a document containing instructions on tying knots, which was neither on paper marked as attorney-client nor in the prisoner's legal folder. The NCIS also found a JTF-Gunatanamo generated e-mail containing information regarding cell locations and other operational details. This e-mail could not possibly have been given to the prisoner by habeas counsel, as counsel lack access to such documents. Neither document raises concerns about the use of attorney client information by anyone, let alone Mr. Al Amin specifically. The Government also reports that a document labeled "FOUO"[39] and unclassified

---

[39] "FOUO" or "For Official Use Only" is an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ." DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added). The designation is specifically "not authorized as an anemic form of classification to protect national security interests" and in fact "is, by definition, unclassified." *Id.* 5400.7-R: C4.1.1; AP3.2.2.3.2. The Protective Order does not prevent prisoners from being in possession of FOUO documents.

documents, including one with a "Secret" designation lined out and marked "Unclassified"[40] were also found within that detainees' attorney client materials.  Neither of these documents supports a review of Mr. Al Amin's privileged materials.  The Protective Order does not prevent prisoners at Guantánamo from possessing unclassified documents.  The government fails to allege that Mr. Al Amin had *any* documents that were *ever* marked "SECRET."

Finally, an apparent suicide note that was handwritten on the back of a piece of paper marked "attorney-client privileged" was found.  The piece of paper was discovered in the mesh of the cell of one of the deceased, not secreted in the privilege folder of any prisoner.  In all likelihood, one prisoner had provided a blank piece of paper from his privilege folder[41] to another prisoner, in order to allow that detainee to express his last wishes to his family.  The government has not offered any reason for suspecting that Mr. Al Amin has harbored or passed notes relating to the three deaths, whether on paper marked "attorney client" or blank paper.

---

[40]     Based on counsel's experience with handling the documents in these cases, it seems quite likely that the document was *once* classified but was declassified and marked accordingly.  It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it.   In a recent court filing, Baher Azmy submitted a declaration in which he describes the government's practice of redacting and declassifying documents stamped "secret" without removing or crossing out the "secret" stamp.  Mr. Azmy confirms, as is alleged herein, that it is common practice to cross out the word "secret" when declassifying documents.  Baher Azmy Decl. ¶ 7 (attached as Exhibit 4 hereto); *see also* Peter Carlson, *Raiding the Icebox*, Washington Post, Dec. 30, 2005, available at http://www.washingtonpost.com/wp-dyn/content/article/2005/12/29/AR2005122901412_pf.html (reporting that a U.S. plan for war with Canada "was declassified in 1974 and the word "SECRET" crossed out with a heavy pencil).

[41]     Counsel supply their clients with pre-addressed paper marked "Privileged and Confidential; Attorney-Client Communications; Attorney-Detainee Materials" in order to facilitate communication.

III.    **ANY FURTHER REVIEW OF MR. AL AMIN'S LEGAL PAPERS SHOULD BE BY THE COURT OR A SPECIAL MASTER.**

If the further review of Mr. Al Amin's legal papers is allowed, the use of a Department of

Defense Filter Team is inappropriate.  As the government hints in its filing, *see* Resp'ts.' Mot. 21

n.12, courts are reluctant to entrust attorney-client privileged materials to such governmental

teams.  Indeed, "the use of government taint teams has often been questioned or outright rejected

by the courts."[42]  Just last week, the Sixth Circuit overruled a district court's decision to permit

review of potentially privileged documents by an independent government "taint team" because

the review posed unacceptable risks to the attorney-client privilege.[43]  Even when such teams

have been authorized, "at least three courts that have allowed for review by a government

privilege team have opined, in retrospect, that the use of other methods of review would have

been better."[44]

Especially given the government's history of interfering with the attorney-client

relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of

monitored attorney-client communications,[45] "it is important that the procedure adopted in this

---

[42]    *In re Search of the Scranton Hous. Auth.*, No. 04-MISC, Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006).  *See, e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege"); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

[43]    *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274, 05-2275, 2006 WL 1915386, at *10-11 (6th Cir. July 13, 2006).

[44]    *United States v. Stewart*, 2002 WL 1300059, at *6.

[45]    *Al Odah*, 346 F. Supp. 2d at 10 n.11.

case not only be fair but also appear to be fair."[46]  Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding our own trust in the honor of [those involved]."[47]  Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[48]

Concerns about the appearance of propriety are especially important here, given the difficulties that counsel has experienced in gaining Mr. Al Amin's trust.  Before meeting with counsel in the aftermath of *Rasul*, Mr. Al Amin had been detained virtually incommunicado for nearly three years without being charged.  He has no access to a law library, faces a language barrier and lacks any knowledge of the American legal system.  Worse, as a result of statements from interrogators and other government personnel, many Petitioners – including Mr. Al Amin – suspected that their civilian attorneys were simply guards or interrogators in disguise.[49]  These suspicions will only intensify when Mr. Al Amin learns (or has learned) that his attorney-client materials are being reviewed by lawyers for the military that detains and interrogates them.

Another unacceptable aspect of the government's proposal is its suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature and whether or not the documents are relevant to the NCIS suicide-plot investigation.[50]  If the filter team determines that the documents are not

---

[46]      *Stewart*, 2002 WL 1300059, at *8.

[47]      *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[48]      *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[49]      *See, e.g.*, Charlie Savage, *Guantánamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, at A1.

[50]      *See* Emergency Mot. at 11.

privileged, the government proposes, that they will be "returned . . . to JTF-Guantánamo for appropriate action."[51]  Such a review for privilege leaves "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate claims of privilege.[52]

The government's motion is a patent attempt to chill attorney-client communications between Mr. Al Amin and his counsel.  In its motion, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system."[53]  This unfounded assertion is a veiled threat to Mr. Al Amin's counsel, designed to deter them from communicating effectively with their client.  Indeed, buried in a footnote is the government's conclusion that because counsel is prohibited "from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[54]  Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, those with access to the legal papers have security clearances, and they are all officers of the Court.  The Court long ago reminded the government that "the Government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[55]  It is not for the government to decide what communications are

---

[51]     *Id.*

[52]     *In re Grand Jury Subpoenas*, 2006 WL 1915386, at *11.

[53]     Emergency Mot. at 10.

[54]     Emergency Mot. at 11 n.10.

[55]     *Al Odah*, 346 F. Supp. 2d at 14.

"directly related" to habeas counsel's representation to their clients.  And there is no warrant for

a new team of Department of Defense lawyers to begin scouring the prisoners' legal papers to

uncover evidence of suicide "plots."

## CONCLUSION

For the preceding reasons, the government's motion should be denied and Mr. Al Amin's

attorney-client materials returned.

DATE:   July 21, 2006

_____/s/_____
Michael D. Hausfeld (DC153742)
Agnieszka M. Fryzman (DC459208)
Avi S. Garbow (DC445399)
Matthew K. Handley (DC489946)
Reena Gambhir
Jason M. Leviton (DC495460)
Matthew B. Kaplan (DC484760)
**COHEN MILSTEIN HAUSFELD & TOLL**
1100 New York Ave, NW, Suite 500W
Washington, DC 20005
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699

John Holland (CO 5246)
Anna Cayton-Holland (CO 35811)
**LAW OFFICES OF JOHN HOLLAND**
2150 W. 29th Ave, Suite 500
Denver, CO 80211
Telephone:   (303) 860-1331
Facsimile:   (303) 832-6506