IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>PETITIONERS SEEKING HABEAS CORPUS RELIEF IN RELATION TO PRIOR DETENTIONS AT GUANTANAMMO BAY | Misc. No. 08-0444 (TFH)<br><br>Civil Action No. 05-2336 (PLF) |

## PETITIONER'S RESPONSE TO JULY 2, 2008 ORDER TO SHOW CAUSE

Counsel for Petitioner Mohammed Al Amin respectfully submit this response to the Court's July 2, 2008 Order to Show Cause why this petition should not be dismissed as moot because Mr. Al Amin has been released from the custody of the United States, *Amin v. Bush*, No. 05-2336, Dkt. No. 44 (D.D.C. July 2, 2008).

Mr. Al Amin, after over five years of detention at Guantanamo without charge, has two requests:

- He would like to know why he was held for years without charge, and in harsh conditions and solitary confinement, even though he was not, in fact, a danger to this country or its citizens; and

- He would like to walk with his head held high, and to have the taint of his unlawful and unwarranted detention removed.

His request is particularly compelling as it appears that the Administration knew not long after his arrival at Guantanamo that Mr. Al Amin was not by any stretch of the imagination a terrorist, had no connection to the attacks on the United States and was not

a member of or affiliated with Al Qaeda or the Taliban.  In fact, Mr. Al Amin had never even heard of Al Qaeda until after the attacks of September 11, 2001.

Counsel has met and conferred with counsel for the United States, who confirmed that the United States is unwilling to consider an admission of error, an apology for the horrific treatment that Mr. Al Amin endured, or even a more satisfactory explanation for the lapses that consumed six years of Mr. Al Amin's life.

The year that Mr. Al Amin was brought to Guantanamo, Donald Rumsfeld, then-Secretary of Defense, called the men detained there "the worst of the worst."  Katherine Q. Seelye, *Threats and Responses: The Detainees*, N.Y. Times, Oct. 23, 2002, at A14. The Administration continued to portray the detainees as, in the words of General Myers, men so dangerous they "would chew through a hydraulics cable" to bring down a C-17 transport plane.  Andrew Buncombe & Andy McSmith, *Five Years on, No End to the Horror that is Guantanamo*, The Independent, Jan. 9, 20007, at 2; Jane Mayer (reviewed by), *The Accused; The First-Person Story of a U.S. Prisoner in the War Against Terror*, Wash. Post., Sept. 10, 2006.

Yet, it was recently revealed that "from the moment that Guantanamo opened in early 2002, former Secretary of the Army Thomas White said, it was obvious that at least a third of the population didn't belong there."  Tom Lasseter, McClatchy Newspapers, *Many at Gitmo Not Tied to Terror*, Belleville News Democrat, June 15, 2008, at A1.  *See also* Jane Mayer, *The Hidden Power; the Legal Mind Behind the White House's War on Terror*, The New Yorker, July 3, 2006, at 44 (a CIA report sent to Washington in August 2002 concluded that many of the Guantanamo detainees "didn't belong there"); Greg Miller, *Many Held at Guantanamo Not Likely Terrorists*, L.A. Times, Dec. 22, 2002, at 1

2

(quoting "military sources with direct knowledge" as stating that many Guantanamo detainees "have no meaningful connection to al Qaeda or the Taliban"). Mr. Al Amin was among this group.

## Statement of Facts

Mr. Al Amin was brought to Guantanamo in August 2002.[1] He obtained counsel in 2005, through an older prisoner who had an attorney and wanted to make sure that Mr. Al Amin, who was just over twenty years old, was represented. A petition for habeas corpus relief was filed on Mr. Al Amin's behalf on December 6, 2005. Counsel obtained the records of Mr. Al Amin's "Combatant Status Review Tribunal" on October 18, 2006.

In February 2007, counsel attempted to file a submission with the Department of Defense Annual Review Board ("ARB") on behalf of Petitioner arguing that even if the Government's facts were accepted as true, there was no basis for his continued detention. Counsel was informed that the submission was unnecessary as Mr. Al Amin would not be receiving an ARB: he had already been "approved to leave Guantanamo." *See* Exhibit A (Detainee Status Notification). Counsel later learned that Mr. Al Amin had apparently been cleared for release for quite some time.

Although he had been "approved to leave," Mr. Al Amin continued to be detained in solitary confinement. In desperation, Mr. Al Amin began a hunger strike to protest his continued detention without charge. During his hunger strike, Mr. Al Amin was strapped in a restraint chair and force fed by a tube through the nose. Mr. Al Amin described how

---

[1] Mr. Al Amin believes he was exchanged for a bounty by Pakistani authorities, a belief that is corroborated by independent investigations. *See* Amnesty International Report, *Pakistan: Human Rights Ignored in the War on Terror*, September 2006; Tom Burgis, *US Fuels Pakistan Bounty Market*, Financial Times, Sept. 28, 2006 (describing bounties earned by Pakistani police and government agents for rounding up "suspects").

3

for each feeding the tube was inserted and removed repeatedly, and jabbed into his stomach, and sinuses. The feeding mixture was pumped into him, until he vomited, at which point he was fed again, until he vomited again. He was left in the restraint chair for hours at a time. When the tube was yanked out, he would lose consciousness from the pain and shock. He would be doused with cold water and locked in a freezing cold room where there was a steel bunk, but no mattress and no blanket. Mr. Al Amin reported being subject to other mistreatment, including abuse that occurred after he was "approved to leave."[2]

Amnesty International took up Mr. Al Amin's case, and began a letter writing campaign on his behalf. *See*, Amnesty International, *USA: Who are the Guantanamo Detainees? Case Sheet 17: Mohammed Al-Amin*, July 14, 2006, attached as Exhibit B.

Five years after his arrival at Guantanamo, and long after being "approved to leave," Petitioner was finally released to his home country of Mauritania in September 2007.

Despite his mistreatment, Petitioner and his family have repeatedly expressed their gratitude, particularly to the many people in the United States and elsewhere who sent letters of support to him and his family, as part of Amnesty International's campaign on his behalf.

**Continuing Injury**

---

[2]  His reports are consistent with reports of other detainees and reports of well respected Human Rights organizations and the Federal Bureau of Investigation. *E.g.,* U.S. DOJ Report, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan and Iraq*, May 2008; Human Rights Watch, Guantanamo: Detainee Accounts 12 (2004), available at http://hrw.org/backgrounder/usa/gitmo1004; Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantanamo*, N.Y. Times, Nov. 29. 2004, at A1.

In *Hudson v. Hardy*, 424 F.2d 854, 855 (D.C. Cir. 1970), the Court of Appeals for the District of Columbia Circuit presided over a petition from a prisoner who contended that "officials of the District of Columbia, purporting to act pursuant to local law, had subjected him to cruel and unusual punishment [and] to punishment without cause." The Court of Appeals rejected the Governments' contention that the petition was moot because the punishment was over, finding "if his punishment was without cause, [the Appellant] is punished anew each time his record is used against him." *Id*. at 856 (citing *Burgett v. Texas*, 389 U.S. 109, 115 (1967) (finding that "admission of a prior criminal conviction which is constitutionally infirm . . . is inherently prejudicial").

Mr. Al Amin was released to his home country in Sub-Saharan Africa on September 27, 2007. That year, Mauritania transitioned to democratic rule after a bloodless coup deposed the prior rulers. *See* CIA, The World Factbook: Mauritania, last updated July 24, 2008, *at* https://www.cia.gov/library/publications/the-world-factbook/geos/mr.html. Mauritania qualifies for debt relief as a "Heavily Indebted Poor Country" and 40% of its population lives in poverty. *Id*. Many of its citizens seek opportunities abroad, as had Mr. Al Amin and members of his family.

Now, as governments cooperate in the global struggle against terrorism, the fact of Mr. Al Amin's detention is, and will continue to be, a factor every time he seeks employment in his home country and elsewhere. It will undoubtedly continue to limit his ability to support himself and his family.

Respondents' decision to release Mr. Al Amin with no more than a brief e-mail notification to counsel that he was "approved to leave" does not remove the continuing injury his wrongful designation as an enemy combatant has caused. In fact, that same e-

5

mail cautioned that the decision to release Mr. Al Amin "does not equate to a determination that your client is not an enemy combatant, nor is it a determination that he does not pose a threat to the United States or its allies." Ex. A. Mr. Al Amin's injury is compounded by Respondents' portrayal of all of the detainees as the "worst of the worst," even while knowing that many, like this Petitioner, were not only not the worst of the worst but in fact should not have been detained at Guantanamo at all.

The first day that counsel met Mr. Al Amin, he told counsel he had never before been to a jail, never committed a crime, never been in any trouble with the police. He said "they are trying to make me be another person, trying to make me say I am a terrorist. But I am a human being who never killed, never fought. I challenge them to make them prove I am a terrorist. If there is really justice, within five minutes in court, I can prove there is no case against me."

He has never had that opportunity.

## Conclusion

For the above reasons, Mr. Al Amin respectfully requests this Court afford him a fair opportunity to clear his name.

Dated: August 6, 2008          Respectfully submitted,

Counsel for Petitioner:

      /s/
-----------------------------------
Agnieszka Fryszman (DC 459208)
Avi S. Garbow (DC 445399)
Matthew K. Handley (DC 489946)
Matthew B. Kaplan (DC 484760)
**Cohen, Milstein, Hausfeld & Toll, P.L.L.C.**
1100 New York Ave, N.W., Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

John Holland (CO 5246)
Anna Cayton-Holland (CO 35811)
**Law Offices of John Holland**
1437 High Street
Denver, CO 80218

Case 1:05-cv-02336-UNA    Document 50    Filed 08/06/2008    Page 8 of 8